**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

SYNERGY MARKETING, INC.,

Plaintiff,

v.

HOME PRODUCTS INTERNATIONAL a/k/a Home Products International-North America, Inc., SELFIX, INC. and TAMOR CORPORATION,

Defendants.

Civil No. 00-796 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER ON SUMMARY JUDGMENT MOTIONS**

---

Brian R. Martens, PARSINEN, KAPLAN, ROSBERG & GOTLIEB, P.A., 100 South Fifth Street, Suite 1100, Minneapolis, MN, 55402, for plaintiff.

Philip J. Young, MOSS & BARNETT, P.A., 4800 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN, 55402, and Irving M. Geslewitz, MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN, P.C., 200 North LaSalle Street, Suite 2100, Chicago, IL 60601, for defendants.

Plaintiff Synergy Marketing, Inc. ("Synergy") brings this action against defendants seeking sales commissions it alleges are owed pursuant to the Minnesota Termination of Sales Representatives Act, Minn. Stat. § 325E.37, for the 180 day period following notices of termination issued to it on March 16, 1998 and on June 25, 1999. This matter

FILED SEP 6 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. SEP
DEPUTY CLERK

is now before the Court on cross-motions for summary judgment. Because the Court finds that defendants terminated Synergy as their sales representative for the territories of Minnesota, North Dakota and South Dakota on March 16, 1998 and for the territory of Wisconsin on June 25, 1999, the Court grants Synergy's motion for summary judgment and denies defendants' motion for summary judgment.

## BACKGROUND

Synergy is a Minnesota corporation that acts as an independent sales representative selling houseware consumer goods to retailers on behalf of manufacturers. Defendant Tamor Corp. ("Tamor") is a Delaware corporation that manufactures and markets plastic storage organization products. Tamor was a wholly-owned subsidiary of Home Products International ("HPI"), as was defendant Selfix, Inc. Both companies have merged into a single operating entity, Home Products International North America ("HNPA")[1].

In June 1995, David Free, president of Woodrow & Free Sales, Inc. ("Woodrow & Free") was hired by Tamor to represent it in the sales territories of Minnesota, North Dakota and South Dakota. On June 29, 1995, Robert Brown, the Vice President of Sales for Tamor, sent Free a letter confirming the parties' agreement and setting forth the terms under which Woodrow & Free would receive commissions. The letter did not specify a contract length and provided that Woodrow & Free would receive 2% commissions on all

[1] Because the entity with which the plaintiff interacted throughout most of the parties' relationship was Tamor, the defendants will collectively be referred to as "Tamor" throughout this opinion.

Tubular Hanger sales and 4% commissions on the balance of the product line. Commissions were to be paid based on "net sales" and were to be paid on all orders submitted from the assigned territories by the 30th of the month following the month of shipment of the merchandise. Free countersigned the letter.

Woodrow & Free subsequently merged into Synergy and Synergy succeeded to Woodrow & Free's relationship with Tamor, including the terms of the June 29, 1995 agreement.[2] As a result of the merger, Synergy had a sales office in Wisconsin, something that Woodrow & Free had not had. Free then began discussions with Bart Plaumann, Tamor's new Vice President of Sales and Marketing, about the possibility of adding Wisconsin to Synergy's existing territory. In January 1998, Tamor agreed to add Wisconsin to Synergy's sales territory. On January 20, 1998, Plaumann sent Free a letter captioned "Addendum to Sales Agreement of June 29, 1995," confirming the parties' agreement and again setting forth the terms under which Synergy would receive commissions.[3] Free again countersigned the letter.

On March 16, 1998, Plaumann called Free and informed him that Tamor was terminating Synergy's services effective immediately because of Tamor's consolidation with HPI. He sent a confirming letter to Free the same day, which read in its entirety:

---

[2] Free became owner and vice president of Synergy.

[3] The letter stated that: "[t]his is to confirm our conversation appointing your organization to represent Tamor Corporation in the State of Wisconsin. This is in addition to your current representation in Minnesota and North and South Dakota to all classes of trade." The letter went on to set forth the way in which commissions were to be determined and paid. The terms concerning commissions were identical to those set forth in the parties' June 29, 1995 agreement.

> Dear Mr. Free:
>
> As per our conversation of today, the services of Synergy Marketing, Inc. are no longer required, effective immediately (March 16, 1998).
>
> Your agency will continue to receive full commissions for all orders that ship on or before April 30, 1998. Your agency will also receive 2% commission on the July ad order we're anticipating and for which we committed $100,000 in advertising.
>
> Dave, while we're confident this decision in the best interest of Tamor and HPI's direction, it is not a reflection on your efforts to support Tamor.
>
> We wish you and your agency the best in your future endeavors.

After discussing Tamor's decision with his partners, Free called Plaumann back to request that Synergy at least be permitted to retain the Wisconsin territory, as the sales in that state were important to its Wisconsin employees. Plaumann later agreed, telling Free in a telephone conversation that Tamor had decided to continue using Synergy as its sales representative in Wisconsin. On March 18, 1998, two days after the termination letter, Plaumann sent Free another letter captioned "Addendum to Sales Agreement of March 16, 1998," again confirming Synergy's representation of Tamor in the Wisconsin territory. The letter read in pertinent part:

> This is to confirm our conversation continuing your representation of Tamor, Inc. in all classes of trade, in the State of Wisconsin with the exception of Menard's in Eau Claire, Wisconsin.
>
> This addendum to your agreement is effective for all shipments effective immediately. Your territory number will remain as #123.

The letter went on to outline the same commission procedures as were contained in the parties' previous agreements. Free countersigned the letter on behalf of Synergy.

Synergy continued to represent Tamor in Wisconsin for more than a year and was then terminated on June 25, 1999. Following the termination, Synergy sent a demand to Tamor for payment of commissions pursuant to the Minnesota Termination of Sales Representatives Act.[4] The letter requested payment for commissions that were expected in the 180 day period following June 25, 1999, as provided for in the statute.

---

[4] The Minnesota Termination of Sales Representatives Act provides in pertinent part:

> Subd. 2. Termination of agreement. (a) A manufacturer, wholesaler, assembler, or importer may not terminate a sales representative agreement unless the person has good cause and:
>
> (1) that person has given written notice setting forth the reason(s) for termination at least 90 days in advance of termination; and
>
> (2) the recipient of the notice fails to correct the reason for termination in the notice within 60 days of receipt of the notice. . . .
>
> Subd. 3. Renewal of agreements. Unless the failure to renew a sales representative agreement is for good cause, and the sales representative has failed to correct reasons for termination as required by subdivision 2, no person may fail to renew a sales representative agreement unless the sales representative has been given written notice of the intention not to renew at least 90 days in advance of expiration of the agreement. For purposes of this subdivision, a sales representative agreement of indefinite duration shall be treated as if it were for a definite duration expiring 180 days after the giving of written notice of intention not to continue the agreement.
>
> Subd. 4. Rights upon termination. If a sales representative is paid by commission under a sales representative agreement and the agreement is terminated, the representative is entitled to be paid for all sales as to which the representative would have been entitled to commissions pursuant to the provisions of the sales representative agreement, made prior to the date of termination of the agreement or the end of the notification period, whichever is later, regardless of whether the goods have been actually shipped. Payment of commissions dues the sales representative shall be paid in accordance with the terms of the sales representative agreement, or if not specified in the agreement, payments of commissions due the sales representative shall be paid in accordance with section 181.145.

Minn. Stat. § 325E.37

Tamor failed to pay Synergy. On October 14, 1999, Synergy also claimed that it was due commissions for the territories of Minnesota, North Dakota, and South Dakota for the 180 day period following the first termination letter of March 16, 1998. Tamor also failed to pay any commissions based on this request.

Synergy then filed suit claiming that Tamor owed it $100,930.01 for commissions in Minnesota, North Dakota and South Dakota for the 180 day time period after the March 16, 1998 letter. Synergy also claims that it is owed $6,944.31 in commissions for the territory of Wisconsin for the 180 day period following its termination on June 25, 1999.[5] Both parties now move for summary judgment.

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is

---

[5] Synergy also alleges that it is due $107,874.32 as a statutory penalty pursuant to Minn. Stat. § 181.145 and is seeking attorneys fees.

genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir. 1981).

## II. Application of the Minnesota Termination of Sales Representatives Act

The primary dispute between the parties is whether Synergy is entitled to commissions for the sales territories of Minnesota, North Dakota, and South Dakota pursuant to the Minnesota Termination of Sales Representatives Act (the "MTSRA"), based on the March 16, 1998 termination notice sent by Plaumann to Free. The MTRSA provides that unless a manufacturer has good cause, it may not fail to renew a sales representative agreement unless the sales representative is given a written notice of intention not to renew the agreement at least 90 days before the expiration of the agreement. Minn. Stat. § 325E.37(2)-(3). If a manufacturer fails to give the required

notice, the sales representative is to be paid for all commissions to which the representative would have been entitled prior to termination of the agreement or until the end of the notification period, whichever is longer. *Id.* at subd. 4. A sales representative agreement of indefinite duration is considered as if it were for a definite duration expiring 180 days after the written notification of intention to terminate the agreement. *Id.* at subd. 3.

Tamor contends that the MTSRA does not apply under these circumstances because Synergy was not actually "terminated" as a result of the March 16, 1998 letter. Instead, Tamor argues that the March 16, 1998 letter was overridden two days later when Tamor agreed to allow Synergy to continue serving as its sales representative in Wisconsin. Tamor maintains that the March 18, 1998 letter acted as a modification of the parties' earlier agreement and rescinded the March 16, 1998 notice of termination. Because the net result was simply a reduction in territory and not a "termination," Tamor argues that Synergy is not due commissions for the 180 days following the March 16, 1998 letter.[6]

---

[6] Tamor also argues that plaintiff's claim for commissions for 1998 is barred by laches, waiver, and estoppel. The Court finds little merit in this argument. Minn. Stat. § 325E.37(5) gives a sales representative the option of pursuing its claims under the statute either through arbitration or through the courts. An arbitration demand must be asserted within one year of the effective date of the statute. Minn. Stat. § 325E.37(6)(b). The statute of limitations for actions involving suits for commissions, however, is three years. Minn. Stat. § 541.07(5). Here, plaintiff chose to pursue its claim through the courts and not through arbitration. Accordingly, the three year statute of limitations governs and plaintiff timely asserted its claim. The Court will not apply equitable doctrines to bar the right of action when it was timely commenced under the appropriate statute of limitations. *See, e.g.*, *Bahr v. City of Litchfield*, 404 N.W.2d 381, 384 (Minn. Ct. App. 1987), *overruled on other grounds*, 420 N.W.2d 570 (Minn. 1988).

The Court finds that the March 16, 1998 letter constituted a termination of the parties' agreement, triggering Synergy's rights under the MTRSA. The March 16, 1998 letter from Plaumann to Free is clear and unambiguous. "Where the terms of a contract are clear and unambiguous, there is no room for construction or interpretation." *Pierce v. Grand Army of the Republic*, 28 N.W.2d 637, 640 (Minn. 1947); *see also Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 215 N.W.2d 473, 476 (Minn. 1974) (same). The letter provided Synergy with notice that it was terminated **effective immediately** as Tamor's sales representative in the territories of Minnesota, North Dakota, South Dakota, and Wisconsin. This clear indication of Tamor's intent is controlling in this case. *Wessels, Arnold & Henderson v. National Medical Waste, Inc.*, 65 F.3d 1427, 1436 (8th Cir. 1995) (applying Minnesota law and explaining that "a court should determine the meaning of a contract in accordance with its plainly expressed intent").

The reasonable interpretation of the later, March 18, 1998 agreement, is that it was a new agreement between the parties with regard to the Wisconsin territory. The fact that the letter was titled an "Addendum" is not persuasive. To find that the March 18, 1998 letter in some way constituted a "modification" of the earlier letter is simply at odds with the basic contract principles and the reality of the facts in this case. A "modification" necessarily implies the existence of an enforceable contract. *Bond v. Charlson*, 374 N.W.2d 423, 429 (Minn. 1985) ("[p]arties may by mutual consent modify **existing** . . . contracts") (emphasis added). Here, there was technically nothing to "modify" as Synergy had already been terminated as of the March 16, 1998 letter. Under basic contract law principles, the March 18, 1998 letter is an offer for a new contract, with Free's

countersignature acting as an acceptance and the formation of a new contract for the territory of Wisconsin. *Travelers Ins. Co. v. Westridge Mall Co.*, 826 F. Supp. 289, 292 (D. Minn. 1992).

Because Synergy was terminated by Tamor on March 16, 1998, it is entitled pursuant to Minn. Stat. § 325E.37 to commissions for the territories of Minnesota, North Dakota and South Dakota for the 180 days after March 16, 1998.[7] Uncontroverted affidavit testimony demonstrates that the commissions earned for those territories in the 180 days following March 16, 1998, were $140,108.42. Defendants have already paid plaintiffs $39,178.41 in commissions, leaving a balance of $100,930.01.[8] Accordingly, defendants are ordered to pay Synergy $100,930.01 in unpaid commissions.

## III. Commerce Clause Challenge

Defendants also argue that any application of the MTRSA to the period during which Synergy was a sales representative only in Wisconsin is unconstitutional under the Commerce Clause of the United States Constitution. Defendants contend that the "dormant" commerce clause prohibits application of the MTRSA in this situation because

---

[7] Synergy was paid commissions for the Wisconsin territory during this time period based on the March 18, 1998 agreement.

[8] In its Brief in Opposition to Plaintiff's Motion for Summary Judgment, defendants raise an objection to plaintiff's calculation of damages. However, that objection, apparently raised for the first time was unaccompanied by any affidavit testimony or other evidence. That mere assertion is insufficient to raise a genuine issue of material fact. Fed. R. Civ. P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . by affidavits or as otherwise provided in this rule, must set forth **specific** facts showing that there is a genuine issue for trial") (emphasis added); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986) (explaining that nonmovant must offer controverting affidavits or evidence from which a reasonable jury could return a verdict in his favor)

the state statute has an extraterritorial reach that has the practical effect of controlling conduct beyond the boundaries of Minnesota. Defendants also argue that enforcement of the MTRSA would have the potential of subjecting manufacturers to inconsistent regulations in violation of the Commerce Clause. The Court concludes that enforcement of the MTRSA to Synergy's services as sales representative in Wisconsin after March 18, 1998 does not violate the Commerce Clause. Under the circumstances here, the MTRSA does not necessarily exert extraterritorial reach and does not unnecessarily burden interstate commerce in violation of the Commerce Clause.

The Commerce Clause provides that "Congress shall have Power . . . To regulate Commerce . . . among the several states." U.S. Const., art. I, § 8, cl. 3. The Supreme Court has "long recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of States to enact legislation affecting interstate commerce." *Healy v. Beer Institute*, 491 U.S. 324, 326 n.1 (1989). State regulation may therefore not overburden interstate commerce. *Cotto Maxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995).

A state regulation is per se invalid under the Commerce Clause when it has an "extraterritorial reach." *Id.* In order to have an "extraterritorial reach," a statute must have the practical effect of controlling conduct beyond state boundaries. *Id.* (citing *Healy*, 491 U.S. at 336). A state statute may not be applied to burden commerce that takes place wholly outside of the state's borders. *Id.*

If a statute is not per se invalid because of extraterritorial reach, but still regulates interstate commerce, one of two levels of scrutiny are applied to it. If the statute

discriminates against interstate commerce on its face or in its effect, the statute is subject to strict scrutiny. *Id.* (citing *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). A statute is also subject to strict scrutiny when the statute was enacted for a discriminatory purpose. *Id.* A statute violates the Commerce Clause, when reviewed under strict scrutiny, unless the statute serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means. *Id.* (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).

However, if the statute regulates evenhandedly, burdening interstate commerce only indirectly, then it is subject to a balancing test. *Id.* (citing *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970)). A statute runs afoul of the Commerce Clause under the balancing test "if the burdens the statute imposes on interstate commerce are 'clearly excessive in relation to the local putative benefits.'" *Id.* (quoting *Pike*, 397 U.S. at 142).

**A. Extraterritorial Reach of MTRSA**

Defendants first argue that the MTRSA is invalid per se because it has an extraterritorial reach. The Court disagrees. "Extraterritorial reach invalidates a statute when the statute **requires** people or businesses to conduct their out-of-state commerce in a certain way." *Cotto Waxo Co.*, 46 F.3d at 792 (emphasis added). The Eighth Circuit has further explained that "a statute has extraterritorial reach when it **necessarily** requires out-of-state commerce to be conducted according to in-state terms." *Id.* at 793 (emphasis added). According to these standards, the MTRSA is not per se invalid.

As in *Cotto Waxo*, the MTRSA does not require Tamor to conduct its commerce according to Minnesota's terms. *Id.* Tamor had the choice to employ a sales representative who is a resident of Wisconsin, avoiding the reach of the MTRSA while still selling its products to Wisconsin consumers. It was Tamor's own decision to contract with a Minnesota resident as its sales representative that created the extension of Minnesota law here. While the MTRSA certainly affected Tamor's participation in interstate commerce in this case, it did not necessarily require Tamor to conduct its commerce in a particular way.

Moreover, it was the parties own agreement that operated to project the law of Minnesota beyond its borders. *See Instruction Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3rd Cir. 1994). The parties could have inserted a contractual provision mandating that Illinois or Wisconsin law, for example, govern the agreement. *See Hagstrom v. American Circuit Breaker Corp.*, 518 N.W.2d 46, 48-49 (Minn. Ct. App. 1994) (applying North Carolina choice of law provision in sales representative agreement between Minnesota sales representative and North Carolina manufacturer). They did not. It was not the state, acting independently of the parties' contract, which dictated the extraterritorial effect that was created in this case. *Institutional Systems, Inc.*, 35 F.3d at 826. Because the MRTSA does not have an extraterritorial effect as that phrase is

defined in Supreme Court and Eighth Circuit case law[9], there is no per se violation of the Commerce Clause in this case.[10]

### B. Application of Pike Balancing Test

Finding that the MTRSA is not per se invalid does not end the Commerce Clause inquiry.[11] As noted above, if a statute is not per se invalid, the Court must determine whether strict scrutiny is to be applied or whether the *Pike* balancing test should be applied. *Cotto Waxo Co.*, 46 F.3d at 793. Because the MTRSA only incidentally burdens interstate commerce and does not discriminate against interstate commerce, the *Pike* balancing test is appropriate here.

"In a Commerce Clause context, 'discrimination' means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the

---

[9] Defendants rely heavily on *Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373 (7th Cir. 1998). In *Morley-Murphy*, the Seventh Circuit examined the constitutionality of the Wisconsin Fair Dealership Law ("WFDL"). The Seventh Circuit did not reach the ultimate question of whether the WFDL violated the Commerce Clause, but did note that the extraterritorial application of the WFDL raised significant questions under the Commerce Clause. *Id.* at 379. However, the WFDL differs from the MTRSA in at least one significant way: it specifically provides that its effects "may not be varied by contract or agreement." The Seventh Circuit noted this distinction when discussing Commerce Clause decisions of the Third and Fifth Circuits. This distinction between the two statutes, as well as the fact that the Seventh Circuit never reached the constitutional question, sufficiently persuades the Court that *Morley-Murphy* is distinguishable from the case here.

[10] It is also important to note that the MTRSA has already been challenged on precisely the same grounds as Tamor challenges it here. In *RIO/Bill Blass v. Bredeson Associates, Inc.*, C6-97-1386, 1998 WL 27299 (Minn. Ct. App., Jan. 27, 1999), the Minnesota Court of Appeals held that the MTSRA does not violate the federal Commerce Clause. *Id.* at *4.

[11] Defendants appear to base their entire Commerce Clause argument on the extraterritorial application of the MTRSA. However, because defendants do raise the issue of the possibility of inconsistent state regulations, albeit in a confusing manner, the Court will proceed to evaluate the appropriate level of scrutiny.

latter." *Id.* at 794 (citing *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994)). The MTRSA does not differentiate between in-state and out-of-state manufacturers with respect to the termination of covered agreements with sales representatives. *Bill Blass*, 1998 WL 27299 at *3. It looks only to whether the manufacturer has terminated a sales representative agreement with a representative who is a Minnesota resident, has their principal place of business in Minnesota, or who's geographic sales territory includes Minnesota. Minn. Stat. § 325E.37(6)(a). As a result, there is no discrimination against interstate commerce.

Because the MTRSA does not discriminate against interstate commerce, the *Pike* balancing test must be applied.[12] The *Pike* test requires the Court to balance the MTRSA's burden on interstate commerce with its local benefits. *Cotto Waxo Co.*, 46 F.3d at 794. The burden on interstate commerce caused by the MTRSA is minimal and incidental. The statute does not impede the flow of goods between states, but only regulates the termination of covered sales agreements. Unlike most Commerce Clause cases, this statute does not impose a tax or tariff on the interstate movement of goods nor does it regulate the way in which goods may enter or exit Minnesota. *Bill Blass*, 1998 WL 27299 at *3.

Defendants also raise the argument that application of the MTRSA in this situation raises the specter of inconsistent state regulation of interstate commerce. The concern

---

[12] There is no contention by defendants that the MTRSA was enacted for a discriminatory purpose. Any such evidence of discriminatory purpose would also trigger strict scrutiny. *Cotto Waxo Co.*, 46 F.3d at 793 n.4.

here is that another state could have an equally far-reaching statute governing sales representative agreements that contains different standards than the MTRSA. While the possibility exists, the Court is not convinced that this is a serious burden on interstate commerce. Again, Tamor was not forced to hire a Minnesota sales representative to cover its Wisconsin territory, nor was it even forced to submit to Minnesota law. The burden on interstate commerce resulting from application of the MTRSA is far from excessive.

In contrast, the statute provides some important local benefits. The MTRSA protects sales representatives with some important connection to Minnesota from the whims of manufacturers with much greater bargaining power. *See Bill Blass*, 1998 WL 27299, at *4. Defendants have failed to demonstrate that the burdens imposed on interstate commerce as a result of application of the MTRSA are "clearly excessive" in relation to the local benefits.

As a result, the MTRSA can be applied in favor of Synergy for the time period after March 18, 1998, when it was acting as Tamor's sales representative for the Wisconsin sales territory. The undisputed facts show that Synergy was terminated on June 25, 1999, and was given no prior notice of the termination. Because the sales representative agreement did not contain a specified length, the contract is deemed to continue for 180 days from the date of termination. Synergy is therefore entitled to

commissions for that time period. The Court orders defendants to pay Synergy $4,629.54 in unpaid commissions for the Wisconsin sales territory.[13]

## IV. Application of Minn. Stat. § 181.145

Plaintiff also argues that it is entitled not only to commissions for the 180 days following the terminations on March 16, 1998 and June 25, 1999, but also to statutory penalties in an equal amount pursuant to Minn. Stat. § 181.45. The MTRSA provides that in the event of termination, "[p]ayment of commissions due the sales representative shall be paid in accordance with the terms of the sales representative agreement or, if not specified in the agreement, payments of commissions due the sales representative shall be paid in accordance with section 181.145." Minn. Stat. § 325E.37(4).

Minn. Stat. § 181.145 is intended "to encourage an employer to make prompt payment of commissions for services that were provided for its benefit." *Huppert v. Twin Cities Featherlite Trailer Sales*, C8-97-949, 1997 WL 785685, at *4 (Minn. Ct. App., Dec. 23, 1997). Indeed, the statute expressly provides for prompt payment of commissions "earned through the last day of employment." Minn. Stat. § 181.145(1). That phrase is defined as "commissions due for services or merchandise which have actually been delivered to and accepted by the customer by the final day of the salesperson's employment." *Id.*

---

[13] Defendants did not provide Synergy with sales reports for the Wisconsin territory for the period subsequent to its termination. However, the commissions for the 180 days prior to termination were $4,629.54. The Court will therefore use that figure as an appropriate figure for commissions for the same 180 days following termination.

Based on the plain language of the statute, when read in connection with Minn. Stat. § 325E.37, the Court finds that Synergy is not entitled to a statutory penalty. There is no contention by Synergy that defendants failed to pay the actual commissions earned through the last day of its employment. Instead, Synergy maintains that in addition to being paid commissions for 180 days after termination, a time period during which it did not actually act as Tamor's sales representative, a penalty should also be levied against Tamor for not promptly paying commissions. Such an interpretation of the two statutes would have the effect of applying two penalties. Minn. Stat. § 325E.37 already "penalizes" Tamor for failing to notify Synergy of its intent to terminate the relationship by forcing it to pay commissions for a significant time period after Synergy was actually working for Tamor. To further penalize Tamor by levying an additional penalty is not required by the statutory language. As noted above, Minn. Stat. § 181.145 only contemplates penalties for commissions earned for services or merchandise "actually . . . delivered to and accepted by the customer." Minn. Stat. § 181.145(1). The statute is clearly intended to force manufacturers to promptly pay sales representatives the commissions that were actually earned during their term as sales representative. Here, Synergy did not actually perform services that would entitle it to invoke the penalty clause. Accordingly, Tamor will not be required to pay Synergy a statutory penalty pursuant to Minn. Stat. § 181.145 or attorneys fees.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Synergy Marketing, Inc.'s motion for summary judgment [Docket No. 9] is **GRANTED**.

2. Defendants' motion for summary judgment [Docket No. 15] is **DENIED**.

3. The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff and that it recover from defendants the sum of $105,559.55.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: 9/6/2001
at Minneapolis, Minnesota.

John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:** September 7, 2001

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# Please forward this announcement to the recipient of this fax.

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500